## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **MATTHEW IGUS,** | **Case No. 2:21-cv-05560-JDW** |
| *Plaintiff,* | |
| v. | |
| **HSBC BANK USA, N.A., d/b/a HSBC** | |
| *Defendant.* | |

## MEMORANDUM

Matthew Igus claims that HSBC Bank USA, N.A. discriminated against him based on his race and national origin and retaliated against him when it terminated him. Unfortunately for Mr. Igus, this is really a case about mismanaging an employee. Although mismanagement leads to poor business outcomes, it doesn't lead to liability under Title VII.

## I.      BACKGROUND

HSBC hired Mr. Igus as a Premier Relationship Manager ("PRM") at its Market Street branch in Philadelphia, Pennsylvania, on February 5, 2018. PRMs at HSBC maintain relationships with clients who have either $70,500 or more in deposits at the bank, direct deposits of at least $5,000 per month, or a mortgage with the bank with an original loan amount of at least $500,000. Kevin Shaw was HSBC's Mid-Atlantic Area Manager when HSBC hired Mr. Igus and throughout his tenure there.

Each quarter, HSBC compares the business performance of PRMs to the performance of other PRMs at similar HSBC branches, using various Key Performance Indicators ("KPI"). There are two categories of KPIs: "activities" KPIs and "output" KPIs. HSBC says that activities KPIs are based on goals that are within a PRM's control, whereas the outcome KPIs are based on things such as bringing in new money. HSBC expects that new PRMs will fail to meet their KPIs in their first two quarters. HSBC categorized the Market Street branch a tier-two branch, so Mr. Igus was ranked against other PRMs at tier-two branches. Throughout his time at the Market Street branch, Mr. Igus received a "good" performance rating, which indicated he was in the bottom half of all tier-two PRMs. Only the bottom 10% of PRMs receive the worst rating: "inconsistent." In contrast, the top 20% of PRMs are rated "top," and the next 30% receive a rating of "strong."

A PRM's performance is tied to whether he receives a bonus. At HSBC, bonuses are discretionary and awarded on a quarterly basis for good performance.  During the ten quarters Mr. Igus worked at the Market Street branch, he received two bonuses. He also received unofficial coaching for subpar performance.

HSBC closed the Market Street branch in May of 2020 and laid off all its employees. That would have been Mr. Igus's fate, but because there was an open PRM position at the nearby Arch Street branch, Mr. Shaw and the branch manager at Arch Street, Dilun Wu, agreed that Mr. Igus would take the position. Mr. Igus transferred to Arch Street with his existing portfolio of clients.

The Arch Street branch is a tier-one branch in Philadelphia's Chinatown neighborhood. Mr. Igus was a poor fit for that position, which usually called for a Mandarin speaker. In fact, Arch Street hadn't hired a mono-lingual employee since 2013. Mr. Igus doesn't speak Mandarin, and he would be the second PRM at the branch alongside a Mandarin speaking PRM. Additionally, the Arch Street branch was a tier-one branch, which altered the KPI metrics that Mr. Igus had to achieve. The transfer also occurred in May of 2020, amidst the onset of the outbreak of the Covid-19 pandemic, and foot traffic into the bank was sparse.

On June 18, 2020, Mr. Igus received formal coaching from Mr. Shaw and Ms. Wu for poor performance. At the coaching, they discussed Mr. Igus's ongoing failure to meet KPIs and strategies to help him improve. On July 23, 2020, Mr. Shaw and Ms. Wu issued Mr. Igus a written warning. Mr. Igus received a final written warning on August 27, 2020. All these steps are in accordance with HSBC's established disciplinary policy for poor performance.

During the meeting on August 27, Mr. Shaw raised his voice and made disrespectful comments to Mr. Igus. In response, Mr. Igus filed a complaint with the employee relations department. As part of his complaint, he claimed that the management at the Arch Street branch favored Mandarin-speaking employees and that he felt singled out for discipline for not speaking Mandarin. As a result of the complaint, Mr. Shaw apologized.

Mr. Igus improved one of his KPI metrics in September of 2020. However, HSBC still terminated Mr. Igus's employment on October 28, 2020. The stated reason for Mr. Igus's dismissal was his poor performance and failure to improve despite multiple warnings. After HSBC terminated Mr. Igus, it replaced him in the PRM role at the Arch Street branch with someone named Cheng (Archie) Kuo, who is of Asian descent.

Mr. Igus filed a Complaint on December 21, 2021, and an Amended Complaint, on July 1, 2022. After a period of discovery, HSBC filed this Motion For Summary Judgment on September 30, 2022.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter, summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he plain language of Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quotations omitted). In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotation omitted). However, "[t]he non-moving party may not merely deny the

allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1)(A)-(B).

## III.   DISCUSSION

Title VII makes it "unlawful . . . for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individuals race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Mr. Igus claims that he was treated differently because he is Black and because he is not of Asian descent. He also alleges that his employer retaliated against him when he complained about discrimination.

### A.    Disparate Treatment

Because Mr. Igus hasn't alleged any direct evidence of discrimination, the Court analyzes his claims under the familiar three-step framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, he must establish a *prima facie* case of discrimination. *See Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 n. 11 (3d Cir. 2004). Then, the employer has a burden of production (but not persuasion) to articulate a legitimate, nondiscriminatory reason for its adverse employment decision. *See id.* If the employer articulates a legitimate reason, the employee must proffer evidence to allow a reasonable factfinder to find, by a preponderance of the evidence, that the employer's proffered reasons are false or pretextual. *See Sarullo v. United States Postal Serv.*, 352 F.3d 789, 797

(3d Cir. 2003) (*per curiam*). Mr. Igus fails to provide evidence sufficient to show his dismissal was pretextual.

### 1.    Preliminary matters

Much of Mr. Igus's arguments relate to his inability to speak Mandarin and the alleged preference for Mandarin speakers at the Arch Street Branch. But language isn't protected under Title VII, and "language and national origin are not interchangeable." *See Baez v. Hill at Whitemarsh*, No. 20-5989, 2022 WL 103188 at *3 (E.D. Pa. Jan. 11, 2022) (quoting *Mumid v. Abraham Lincoln High Sch.*, 618 F.3d 789, 795 (8th Cir. 2010)). I agree with those cases that refuse to equate language and national origin. There are many Americans who are not of Asian descent, including Black Americans, who speak Mandarin. And there are Americans of Chinese descent who do not speak Mandarin. Therefore, I won't consider facts that only show the Arch Street branch had a preference for Mandarin speakers because that evidence doesn't demonstrate discrimination.

### 2.    *Prima facie* case

To establish a *prima facie* case of discrimination, the claimant must demonstrate, by a preponderance of the evidence, that (1) he is a member of a protected class, (2) he was qualified for the position he held, (3) he suffered an adverse employment action, and (4) similarly situated persons who are not members of the protected class were treated more favorably, or that the circumstances of his termination give rise to an inference of discrimination. *See Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410–11 (3d Cir. 1999);

*Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 327 (3d Cir. 2015). HSBC doesn't dispute the first three elements.

As to the fourth, Mr. Igus has evidence that HSBC replaced him with Mr. Kuo, who is of Asian descent. Evidence that a plaintiff was replaced by someone who is not a member of the protected class raises an inference of discrimination. *See Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 638 (3d Cir. 1993); *Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061, 1066 n.5 (3d Cir. 1996). Therefore, Mr. Igus has raised a *prima facie* of discrimination both as to race and national origin.

### 3.      Legitimate Nondiscriminatory Reason

An "employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes v.* Perskie, 32 F.3d 759, 763 (3d Cir, 1994). HSBC produced evidence that it fired Mr. Igus for his poor performance and his failure to improve that performance, including his inability to meet KPIs and his low performance ratings over the course of his employment. Therefore, it has met its burden of production.

### 4.      Pretext

To show that a defendant's proffered justifications are pretextual, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; *or* (2) believe that an invidious discriminatory reason was more likely than not a motivating or

determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764 (emphasis added).

To prevail, "the non-moving plaintiff must demonstrate such weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate

reasons for its action that a reasonable factfinder *could* rationally find them unworthy of

credence." *Id.* at 765 (quotations omitted, emphasis in original). Mr. Igus's evidence of

pretext fails to raise a dispute of material fact that could either casts doubt on HSBC's

proffered reasons for firing him, or that could show invidious discrimination was the true

reason for his dismissal.

### a.      Reasons to disbelieve

Mr. Igus tries but fails to cast doubt on HSBC's proffered reasons for firing him.

Based on the evidence and the undisputed facts, he can't demonstrate the level of

weakness required to show pretext. Therefore, no reasonable jury could disbelieve them.

### i.      Inconsistencies in testimony

Mr. Igus points to two inconsistencies in HSBC employees' deposition testimony

that he says raise doubts about HSBC's justification for firing him. *First*, Mr. Igus says

there's inconsistent testimony as to who the decision makers were. He notes that HSBC's

response to Mr. Igus's Interrogatory No. 3 stated that Ms. Wu and Mr. Shaw made the

decision to terminate him. Ms. Wu testified that she and Mr. Shaw made the decision in

consultation with human resources. Mr. Shaw testified that he, Ms. Wu, and Esa Street (a

representative from HSBC's employee relations division), made the decision in

consultation with Bertha Rozier and Tony Glover (Mr. Shaw's direct superiors). Finally, Ms. Street testified that she, Ms. Wu, Mr. Shaw, and Ms. Rozier made the decision.

These minor variations don't rise to a level of inconsistency sufficient to call into question HSBC's justifications. Inconsistent testimony regarding decisionmakers could sometimes impugn the defendant's credibility, particularly when it indicates an attempt to hide the decisionmaker's identity, which might indicate a discriminatory motive. But that's not what happened here. In this case, there's no dispute that Mr. Shaw and Ms. Wu participated in the decisionmaking process. The fact that they consulted with other people at HSBC about whether to fire Mr. Igus is not unusual. Nor is it unusual that the relevant actors' memories about theirs and others' levels of participation differ, or that some deponents decided to be over inclusive when naming who was involved. Mr. Igus hasn't connected why this inconsistency provides a reason to disbelieve HSBC's proffered justification beyond the fact of the inconsistency itself. Therefore, even given the most generous inference in Mr. Igus's favor, this testimony fails to show pretext.

*Second*, Mr. Igus says there is inconsistent testimony regarding the reason he was fired. That representation is disingenuous. All witnesses agreed he was fired for poor performance and lack of improvement. At her deposition, Ms. Wu noted that she also considered Mr. Igus's "negative attitude" as a factor for his dismissal, but that "[m]ostly of it [sic] came from . . . consistently poor performance." (ECF No. 27-35 at 78:5-12.) The fact that Ms. Wu also considered Mr. Igus's attitude doesn't create any inconsistency because

Mr. Igus doesn't dispute that everyone, including Ms. Wu, agreed that he was fired for poor performance. Ms. Wu's personal considerations don't undermine that justification.

### ii.        Rude, unfair, and aggressive treatment

Mr. Igus argues that HSBC's proffered justification is pretextual because Ms. Wu and Mr. Shaw treated him "rudely, disrespectfully and offensively." (ECF No. 27 at 12.) For example, he says that Ms. Wu ignored him, pawned him off on other workers, and refused to help him or refer clients to him. He claims that Ms. Wu called him "disruptive" and "argumentative." Finally, he claims Mr. Shaw called him "delusional" and raised his voice at Mr. Igus during the meeting in which Mr. Igus received his final warning.

That alleged behavior doesn't undermine HSBC's justification for firing him. *First*, it's not clear that the evidence says what Mr. Igus claims it says because Mr. Igus cherry picks his own deposition testimony. For example, he testified that Ms. Wu didn't help him find customer leads (ECF No. 27-2 at 189:3-5), but he later admitted she sent him a list of "customer opportunities." (*Id.* at 193:6-8.) Additionally, he says that Ms. Wu refused to help him, but he also testified that she was "negligent because she wasn't there to help me *or the team*," (*Id.* at 253:9-12 (emphasis added)), which suggests that she didn't target her unhelpful behavior at him. He also acknowledges that Mr. Shaw expressed regret after his outburst in Mr. Igus's final warning meeting and apologized to Mr. Igus for that behavior.

*Second*, and more importantly, Mr. Igus admits that neither manager made negative comments about his race or national origin. (*See id.* at 256:17-21.) Insults such as "delusional" or "disruptive" are irrelevant to the discrimination analysis because they do not implicate race or national origin-based discrimination. *See, e.g., Gresham v. Del. Dep't of Health & Soc. Servs.*, 821 Fed. Appx. 146, 151 (3d Cir. 2020). Therefore, this evidence can't help Mr. Igus show pretext.

### iii.      Failure to follow progressive discipline policy

Mr. Igus argues that HSBC failed to follow its own progressive disciplinary policy because management didn't issue him a verbal warning prior to issuing him written warnings, which calls into question HSBC's reason for firing him. He's wrong. HSBC's official "Corrective Action Policy" doesn't mention a mandatory verbal warning. Instead, it calls for "steps" that "attempt to correct the [conduct or performance] issue," including "informal coaching and/or formal steps such as an Initial Warning, Written Warning, or Final Written Warning." (ECF No. 28-10 at 3.) It also says that the "steps may vary in length dependent upon a variety of factors and may either be extended or shortened at the manager's and HR's discretion." (*Id.*) The policy also allows managers to bypass steps. Therefore, not only aren't verbal warnings required, but the progressive disciplinary policy isn't mandatory, so it isn't evidence of pretext. *See Emmett v. Kwik Lok Corp.*, 528 Fed. App'x 257, 262 (3d Cir. 2013) (citing *Morris v. City of Chillicothe*, 512 F.3d 1013, 1020 (8th

Cir. 2008) (noting the non-mandatory nature of a disciplinary policy "negate[s] its persuasiveness in sowing pretext")).

### iv.    Replacement outside the protected class

Mr. Igus re-asserts the fact that he was replaced by a PRM of Asian descent as a reason to disbelieve HSBC's explanation for firing him. Although that was sufficient to make out a *prima facie* case because it raises an inference of discrimination, it doesn't call into question HSBC's justification. Mr. Igus's replacement was hired seven months after his dismissal. That's too long a gap to infer causation and to show pretext. Therefore, this argument fails.

### b.    Comparator evidence

A plaintiff can establish pretext by showing that his employer treated similarly situated employees outside of the protected classes better than it treated him. *See Fuentes*, 32 F.3d at 765. To be similarly situated, the comparator employees must be "similarly situated in all relevant respects." *Id.* at 882. "A determination of whether employees are similarly situated takes into account factors such as the employees' job responsibilities, the supervisors and decision-makers, and the nature of the misconduct engaged in." *Id.*

HSBC did not treat any of the six PRMs that Mr. Igus claims as comparators better than him.

- <u>Jimmy To</u>: Mr. To was a PRM at the Arch Street branch. He underperformed for at least two quarters while at that branch, but he wasn't disciplined. However, those were his first two quarters as a PRM, and it's undisputed that HSBC doesn't expect PRMs to meet their KPIs in their first two quarters. Mr. Igus also underperformed in his first two quarters as a PRM and wasn't disciplined for it. Therefore, HSBC treated Mr. To the same as Mr. Igus.

- <u>Shanny So</u>: Ms. So worked with Mr. Igus as a PRM at the Arch Street branch. Ms. So was ranked in the top 50% of PRMs both quarters she worked with Mr. Igus at Arch Street, while he ranked near the bottom. Mr. Igus claims Ms. So admitted that she underperformed during two quarters but wasn't disciplined. That mischaracterizes her deposition testimony. Instead, Ms. So said that during a single quarter in 2021 she failed to meet two KPIs. (ECF No. 27-33 25:12-26:8.) That is not the same as underperforming in two quarters. Mr. Igus also argues that Ms. So exhibited "poor customer service-related skills" because a client once complained about her and that she was treated better than he was because she wasn't disciplined for it. But there's undisputed evidence that Mr. Igus received multiple client complaints that didn't result in any disciplinary action. (*See* ECF Nos. 28-7, 28-9.) Therefore, the evidence doesn't show that HSBC treated Ms. So better than Mr. Igus. It just shows that she outperformed him.

- <u>Yan Zhi Huang</u>: From 2018-2020, Ms. Huang was a PRM at HSBC's Arlington, Virginia branch, which was a tier-two branch under Mr. Shaw's direction. Mr. Igus claims

Ms. Huang's rankings were worse than his but that she was never disciplined, but that's not the full story. Between 2018-2020, Ms. Huang outranked Mr. Igus in four quarters, and Mr. Igus outranked Ms. Huang in three quarters. During that period, neither received any formal discipline. When her performance declined, Ms. Huang resigned before management could discipline her. Therefore, there's no evidence that HSBC treated Mr. Igus differently than Ms. Huang.

- <u>Jenny Huamani</u>: Ms. Huamani worked as a PRM in the Alexandria, Virginia branch. Her performance was either similar to or worse than Mr. Igus's during the 2019 fiscal year, and she was disciplined while Mr. Igus was not. Management issued Ms. Huamani a final written warning in December 2019, despite improved performance during that quarter. Mr. Igus argues that HSBC treated Ms. Huamani better than him because she wasn't fired. But Ms. Huamani resigned not long after her final written warning, so it's impossible to know if she would have been terminated. Therefore, Mr. Igus can't show that Ms. Huamani was treated better than he was.

- <u>Archie Kuo</u>: HSBC hired Mr. Kuo as Mr. Igus's replacement in May 2021. As expected, Mr. Kuo didn't meet his KPI goals during his first quarter at HSBC. HSBC sold the Arch Street branch before Mr. Kuo's second quarter evaluation, so there's no evidence that HSBC treated Mr. Kuo better than Mr. Igus.

- <u>Lian Wang</u>: Mr. Wang worked two quarters as a PRM at the Arch Street branch in 2018, prior to Ms. Wu's tenure there. As expected, he failed to meet KPIs in his

first two quarters. He resigned shortly after, so there's no evidence that HSBC treated him differently than Mr. Igus. And, because he worked there before Ms. Wu took over the branch, the different management also sets him apart.

Mr. Igus fails to show that any of these comparators were treated better than he was. The fact that some resigned before they could be terminated doesn't mean Mr. Igus was treated worse, it just means they read the writing on the wall. Accordingly, Mr. Igus hasn't put forward evidence that suggests HSBC's proffered justification for firing him is unbelievable or that the real reason was invidious discrimination.

### B.     Retaliation

To establish a *prima facie* case of retaliation, a plaintiff must show that (1) he engaged in protected activity, (2) he suffered an adverse employment action, and (3) there was a causal connection between the protected activity and the adverse employment action. *Kengerski v. Harper*, 6 F.4th 531, 536 (3d Cir. 2021). As with Mr. Igus's discrimination claims, there's no question that he suffered an adverse employment action. The Parties only dispute the first and third elements. Because he can't show that his complaint caused the adverse employment action, Mr. Igus's claim fails.

### 1.     Protected activity

Mr. Igus filed a human resources complaint after the meeting in which Ms. Wu and Mr. Shaw issued him his final written warning. He admitted at his deposition that he didn't raise the issue of racial discrimination in that complaint. However, there is a genuine

dispute of material fact whether he complained about national origin-based discrimination.

### 2.   Causation

"An employee cannot easily establish a causal connection between his protected activity and the alleged retaliation when he has received significant negative evaluations before engaging in the protected activity." *Ross v. Gilhuly*, 755 F.3d 185, 194 (3d Cir. 2014) (citing *Shaner v. Synthes*, 204 F.3d 494, 504-05 (3d Cir. 2000)). HSBC's proffered reason for Mr. Igus's dismissal is consistent with the evaluations and written discipline it issued to him prior to the complaint. Based on the undisputed facts in this case, Mr. Igus can't show causation.

HSBC's rationale for dismissing Mr. Igus was the same both before and after he engaged in any protected activity. It is undisputed that Ms. Wu and Mr. Shaw issued Mr. Igus multiple disciplines for poor performance, including a final written warning, before Mr. Igus filed a complaint. It's also undisputed that the final written warning gave Mr. Igus 60 days to improve, and that his failure to do so could result in his termination. The timing of Mr. Igus's dismissal was consistent with that probation period. Mr. Igus also admitted that he believes Ms. Wu and Mr. Shaw intended to fire him before he complained. (ECF No. 25-6 at 234:5-235:5.) An employee's complaint should put an employer on notice not to retaliate, and it might have the practical effect of delaying adverse employment decisions. But as a matter of law, the complaint cannot be a barrier to the employer's

continued need to manage its workforce. In this case, that meant that HSBC was free to continue with its discipline of Mr. Igus, up to and including his termination. Because the undisputed facts show that that termination was in process before he complained, no reasonable juror could find that Mr. Igus's complaint caused his dismissal.

## IV.    CONCLUSION

Maybe HSBC shouldn't have placed Mr. Igus at the Arch Street branch. But it did. Maybe HSBC could have managed Mr. Igus better once he was at the branch. But in the end, HSBC was within its rights to dismiss Mr. Igus for his continued underperformance at the Arch Street branch. Doing so did not violate Title VII, so I will grant HSBC's motion for summary judgment. An appropriate Order follows

BY THE COURT:

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

April 4, 2023